IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CARLENE BENNETT, | ) | CASE NO.  1:22-CV-00972-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| vs. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | **MEMORANDUM OF OPINION AND** |
| ADMINISTRATION, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Carlene Bennett ("Plaintiff" or "Bennett"), challenges the final decision of Defendant,

Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for

a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income

("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.*

("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties,

pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is

AFFIRMED.

## I.    PROCEDURAL HISTORY

In January 2020, Bennett filed applications for POD, DIB, and SSI, alleging a disability onset date

of September 10, 2019, and claiming she was disabled due to major depressive disorder, Type 2 diabetes

mellitus without retinopathy, cervical radiculitis, carpal tunnel syndrome, obesity, and osteoarthritis of the

knees.  (Transcript ("Tr.") at 26, 70.)  The applications were denied initially and upon reconsideration, and

Bennett requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 26.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On April 22, 2021, an ALJ held a hearing, during which Bennett, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On June 1, 2021, the ALJ issued a written decision finding Plaintiff was not disabled before April 22, 2021, but became disabled on that date and continued to be disabled through the date of the decision.  (*Id.* at 26-40.)

On June 8, 2021, Bennett filed a Request for Review with the Appeals Council.  (*Id.* at 182-85.)  On May 25, 2022, the Appeals Council accepted Bennett's request for review and issued a decision finding Bennett disabled as of June 1, 2021.  (*Id.* at 8-13.)

On June 7, 2022, Bennett filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 10-11.)  Bennett asserts the following assignments of error:

(1) The ALJ erred in failing to recognize Ms. Bennett's carpal tunnel syndrome as severe and in finding she could frequently handle and finger.

(2) The ALJ's assessment of Ms. Bennett's residual functional capacity, in regard to her ability to stand and walk, is not supported by substantial evidence.

(Doc. No. 10.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Bennett was born in July 1966 and was 54 years-old at the time of her administrative hearing (Tr. 26, 50), making her a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(d), 416.963(d).  She has past relevant work as a Lyft driver and CNA.  (Tr. 37.)

### B.    Relevant Medical Evidence[2]

On July 29, 2019, Bennett saw Lauren Fuller, M.D., for evaluation of her bilateral knee pain.  (*Id.*

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Bennett only challenges the ALJ's findings regarding her physical impairments, the Court further limits its discussion of the evidence accordingly.

at 340-41.)  Bennett reported intermittent knee pain for years, occasional swelling, no locking, occasional give away of both knees, bilateral knee clicking, and no known injury.  (*Id.* at 340.)  She told Dr. Fuller she could walk up to a half mile without taking a break, but that her knees start to hurt quickly when she is walking.  (*Id.*)  Bennett reported being told years ago she needed knee replacements but that she was too young at the time.  (*Id.*)  She swam for exercise as it did not hurt her knees.  (*Id.*)  Bennett used topical pain medicine and was interested in doing physical therapy again, as it had helped some in the past.  (*Id.*)  On examination, Dr. Fuller found normal flexion with pain on the left but no pain on the right, normal extension without pain, normal hyperextension without pain, crepitus on the left, negative drawer tests, negative Lachman's and McMurray's, negative Appley grind, no patellar apprehension, and no pain/instability with valgus and varus stress.  (*Id.* at 341.)  Dr. Fuller diagnosed Bennett with chronic pain of both knees and osteoarthritis of both knees.  (*Id.*)  Dr. Fuller ordered x-rays and physical therapy.  (*Id.*)

X-rays of the bilateral knees taken that day revealed "[s]evere bilateral medial compartment joint space narrowing with bone-on-bone articulation and subchondral sclerosis," as well as tricompartment marginal osteophytes.  (*Id.* at 368-69.)  The impression dictated by Allan Chiunda, M.D., was "[s]evere bilateral medial compartment osteoarthritis."  (*Id.* at 369.)

On August 5, 2019, Bennett saw Kevin Bailey, PA-C, for knee pain, left worse than right.  (*Id.* at 338-39.)  Bennett reported she had been told she had bilateral knee arthritis, and that she had been told to have bilateral knee replacements a few years ago but had not done so.  (*Id.* at 339.)  On examination, Bailey found an antalgic gait favoring the left knee but no assistive device, bilateral knee effusion, intact extensor mechanisms without pain, limited range of motion with crepitus bilaterally, "notable pain with patellar femoral compression," negative drawer tests, no instability, and intact motor, distal, and sensory exams.  (*Id.*)  Bennett wanted to try exercise and physical therapy at the time and declined injections.  (*Id.*)  Bailey noted he discussed with Bennett that she was not a surgical candidate at the time because of her

3

body habitus. (*Id.*)

On August 7, 2019, Bennett saw Tanya Wagner, PT, for her first physical therapy appointment. (*Id.* at 336.) Wagner noted Bennett's impairments included pain, decreased range of motion, decreased strength, decreased balance, altered gait, and body habitus. (*Id.*) Bennett rated her pain as a 6/10 and described it as aching and occurring when she was standing, walking, and taking the stairs. (*Id.* at 337.) On examination, Wagner found 0 degrees extension (with 5+ degrees of recurvatum) and 89 degrees of flexion on the right, 0 degrees extension (with 5+ degrees of recurvatum) and 90 degrees of flexion on the left, hamstring tightness bilaterally, hip flex strength of 3+/5 bilaterally, knee extension strength of 4+/5 bilaterally, and dorsiflexion strength of 5/5 bilaterally. (*Id.* at 337-38.) Wagner noted an abnormal gait with increased lateral sway and decreased heel strength. (*Id.* at 338.) Wagner rated Bennett's prognosis as fair. (*Id.* at 336.)

On August 21, 2019, Bennett saw Amy Slaby, PTA, for her fourth physical therapy appointment. (*Id.* at 332.) Bennett reported the CP helped her knees and that she was not as sore as she had been. (*Id.*) Bennett rated her pain as a 2/10. (*Id.*) Slaby noted Bennett demonstrated improvements in knee pain, function, and range of motion. (*Id.*) On examination, Slaby found 0 degrees of extension and 110 degrees of flexion on the right and 0 degrees of extension and 105 degrees of flexion on the left. (*Id.*)

On August 24, 2019, Bennett went to the emergency room with complaints of lower back pain and left knee pain following a motor vehicle accident. (*Id.* at 328.) Bennett reported being rear-ended, that she was wearing her seatbelt, and that the airbag did not deploy. (*Id.*) Bennett complained of diffuse lower back pain and throbbing left knee pain. (*Id.* at 328-29.) On examination, treatment providers found normal range of motion, no edema or tenderness of the extremities, tenderness to palpation in the generalized lower lumbar region, limited active flexion and extension of the lumbar spine, limited lateral bending, full lower extremity strength, intact sensation, negative Babinski sign bilaterally, and antalgic

4

gait.  (*Id.* at 330.)  Bennett received Toradol and Flexeril in the emergency room, and after reporting some improvement, was discharged with a prescription for Flexeril.  (*Id.*)

Bennett continued physical therapy throughout September 2019.  On September 4, 2019, PT Wagner noted improvement in range of motion of the knees bilaterally, increased strength, and improved functional mobility, although Bennett continued to be limited in rising from a chair, standing, walking in the community, negotiating stairs, and physical activities.  (*Id.* at 326.)  Wagner found functional gains of improved ability to climb steps, improved balance/decreased risk of falls, increased endurance/activity tolerance, increased independence with her home exercise program, and decreased intensity and frequency of pain.  (*Id.*)  Bennett rated her knee pain as a 2/10 before the session and a 0/10 after the session.  (*Id.* at 327.)  No assistive device was used.  (*Id.* at 328.)  On September 11, 2019, Bennett reported her accident made her back pain worse, she had been out canvasing with her church, so she had done a lot of walking that day, and she had to take the stairs where she currently lived, but she was trying to find a first-floor unit.  (*Id.* at 324-25.)  On September 16, 2019, Bennett reported feeling her legs were getting stronger and that she was able to walk for an hour, stopping and talking, and then walking another half hour.  (*Id.* at 323.)  She could not stand for that long before.  (*Id.*)  PTA Slaby noted improvements in tolerance progression of standing weight-bearing exercises, decreased pain levels, and improved function.  (*Id.*)  Bennett rated her pain as a 2/10 before therapy and a 4/10 after therapy.  (*Id.*)

On October 4, 2019, Bennett saw Kimberly Svec, FNP-C, for a physical and lab work.  (*Id.* at 416.)  Bennett reported one fall without injury in the past year and denied difficulty walking and problems with imbalance.  (*Id.*)  Bennett also denied difficulties performing activities of daily living and joint pain. (*Id.* at 416-17.)  On examination, Svec found no CVA tenderness, normal range of motion of the spine, and no gross abnormalities of the musculoskeletal system.  (*Id.* at 417.)

5

On July 17, 2020, Bennett underwent a physical consultative examination with Dorothy Bradford, M.D.  (*Id.* at 450.)  Bennett complained of bilateral carpal tunnel and knee pain.  (*Id.*)  Bennett told Dr. Bradford she had carpal tunnel in both hands, and experienced numbness and tingling in the thumb and first two fingers of both hands, mainly at night.  (*Id.*)  Bennett had received injections and wore night braces.  (*Id.*)  Bennett reported her hand use was "still normal."  (*Id.*)  Bradford also told Dr. Bradford she had degenerative joint disease in both knees and sometimes used a cane.  (*Id.*)  Bradford also had diabetes and her feet went numb.  (*Id.*)  On examination, Dr. Bradford found normal strength, normal range of motion of all joints, no joint effusions, no muscle masses, no clubbing, cyanosis, or edema, even and regular gait with no apparent limp, shuffle, or other disturbance, no mobility aid, and positive Phalen and Tinel signs bilaterally.  (*Id.* at 451.)  Dr. Bradford opined Bennett had "mild bilateral carpal tunnel syndrome, super morbid obesity, non insulin dependent diabetes and DJD of the knees."  (*Id.*)  Dr. Bradford noted Bennett did not use a mobility aid.  (*Id.*)

On August 18, 2020, Bennett saw Deidra Bobincheck, NP, to establish care.  (*Id.* at 454.)  Bennett reported several situational community problems and pain in her knees, back, and neck.  (*Id.*)  Bennett told Bobincheck she was not working because of pain and that she was an STNA but could not lift anymore.  (*Id.*)  Bennett endorsed occasional wheezing, back pain, joint pain, myalgias, and neck pain.  (*Id.* at 455.)  On examination, Bobincheck noted no abnormal physical findings.  (*Id.*)  Bennett's diagnoses consisted of diabetes mellitus, Type II, without retinopathy, primary osteoarthritis of both knees, depression, bilateral carpal tunnel syndrome, and obesity.  (*Id.* at 456.)  Bobincheck noted Bennett would undergo physical therapy for her knees when her social situation was better.  (*Id.*)

On November 11, 2020, Bennett saw Miodrag Zivic, M.D., for a pre-surgery consultation.  (*Id.* at 482.)  Dr. Zivic noted Bennett was scheduled for a left carpal tunnel release.  (*Id.*)  Bennett reported numbness/tingling and pain in her left hand for over 10 years, with pain worse at night.  (*Id.* at 483.)

6

Bennett also complained of grip weakness.  (*Id.*)  Bennett reported wearing a wrist splint at night.  (*Id.*)  She had received injections in the past but did not experience any relief with her last injection.  (*Id.*)  Bennett also complained of bilateral knee arthritis and told Dr. Zivic she needed knee replacements.  (*Id.* at 485.)  On examination, Dr. Zivic found bilateral knee tenderness and effusions, bilateral tenderness and pain with hand grips, left worse than right, no thenar atrophy, and decreased grip strength on the left.  (*Id.*)

On November 18, 2020, Bennett underwent left wrist carpal tunnel release surgery.  (*Id.* at 494.)

## C.    State Agency Reports

On July 20, 2020, Elizabeth Das, M.D., reviewed the file and opined Bennett could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 74-75, 83-85.)  Bennett had an unlimited ability to push and/or pull, other than shown for lift and/or carry, in the upper and lower extremities.  (*Id.* at 74, 83.)  She could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds.  (*Id.* at 75, 84.)  Bennett could frequently stoop and crouch, and occasionally kneel and crawl.  (*Id.*)  Her ability to balance was unlimited.  (*Id.*)  Bennett must avoid even moderate exposure to hazards.  (*Id.*)

On September 21, 2020, on reconsideration, Gerald Klyop, M.D., affirmed Dr. Das' findings.  (*Id.* at 94-95, 102-03.)

## D.    Hearing Testimony

During the April 22, 2021, hearing, Bennett testified to the following:

- She drove for Lyft after the alleged onset date.  (*Id.* at 52.)  She worked from 6:00 a.m. to 9:00 a.m. three to four days a week.  (*Id.* at 53.)

- Her pain prevents her from working.  (*Id.* at 55.)  In August 2019 she was rear ended and went to physical therapy for back pain, but it did not help.  (*Id.*)  She continued to have back pain.  (*Id.*)  She continued doing physical therapy and swimming, but it did not help.  (*Id.*)  She also has knee pain.  (*Id.*)  It is difficult for her to get up from sitting without using her hands.  (*Id.*)  When it rains or snows, she feels it in her joints, and it makes her uncomfortable.  (*Id.*)  The pain and stiffness is in both knees,

although the left was worse than the right. (*Id.* at 55-56.) She keeps asking for a knee replacement, but her doctors say she is too young. (*Id.* at 56.) Her insurance refuses to cover gel injections. (*Id.*) She takes a pain medication called Meloxicam and she uses a heating pad and liniments, which help somewhat. (*Id.*) She has trouble standing and walking. (*Id.*) She can walk maybe 100 feet but would have to stop about twice. (*Id.*) If the weather is nice, she will go for a short walk. (*Id.* at 56-57.) She usually takes her walker with her in case her knees give out. (*Id.* at 57.) A friend of hers gave her the walker. (*Id.*)

- Carpal tunnel syndrome causes numbness in her hands. (*Id.*) The pain used to keep her up at night for years. (*Id.*) She had cortisone shots. (*Id.*) She dropped things and it was hard for her to grab things for a long period of time. (*Id.*) She did have carpal tunnel surgery on her left hand. (*Id.*) The surgery took away the numbness, but she still has a little bit of pain. (*Id.* at 58.) Her right hand is getting worse, but she is afraid to have surgery on that hand because she needs knee surgery, she doesn't have anyone who lives with her that can care for her, and she needs her right hand to push up from a sitting position. (*Id.*) She has trouble gripping and grasping with both hands. (*Id.*) It is hard for her to use a can opener and carry anything over 10 or 15 pounds. (*Id.*) She tries to handle things with her body more than her hands by wrapping her arms around things. (*Id.* at 58-59.) Most of her clothes are pull-on and she tries to get shoes without laces. (*Id.* at 59.)

The VE testified Bennett had past work as a Lyft driver and CNA. (*Id.* at 61.) The ALJ then posed the following hypothetical question:

> For this hypothetical, the individual is limited to work at the light exertional level. She cannot climb ladders, ropes, or scaffolds. She could frequently stoop or crouch and could occasionally kneel or crawl. And she must avoid even moderate exposure to hazards such as machinery or heights. She has a limitation of only frequent handling or fingering. Additionally, she can understand, remember, and follow simple instructions for routine tasks. She can complete familiar routine tasks without expectations for sustained close concentration, fast-paced or high production standards. She can adapt in a setting with predictable expectations and infrequent changes in routine. Would that individual be able to perform any of Ms. Bennett's past work or any other work in the national economy?

(*Id.* at 62.)

The VE testified the hypothetical individual would not be able to perform Bennett's past work as a Lyft driver and CNA. (*Id.* at 62-63.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as office helper or clerical assistant, cafeteria attendant, and mailroom clerk. (*Id.* at 63.)

The ALJ modified the hypothetical by reducing standing and walking to four hours a day.  (*Id.*) The VE testified his testimony about the representative jobs in the economy would not change.  (*Id.*)  A reduction to two hours of standing and walking a day would require accommodation by the employer.  (*Id.* at 64.)

In response to a question from Bennett's counsel, the VE testified a limitation to occasional handling and fingering would be work preclusive.  (*Id.* at 65-66.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that she

9

suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Bennett was insured on her alleged disability onset date, September 10, 2019, and remained insured through December 31, 2023, her date last insured ("DLI").  (Tr. 26.)  Therefore, in order to be entitled to POD and DIB, Bennett must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The Appeals Council made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

10

3.   The claimant has had the following medically determined severe impairments: osteoarthritis of the knees; lumbar strain; morbid obesity; major depressive disorder; and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.   For all times relevant the claimant's impairments result in the following limitations on their ability to perform work-related activities: light work as defined in 20 CFR 404.1567(b) and 416.967(b) except cannot climb ladders, ropes, or scaffolds; can frequently stoop or crouch, and occasionally kneel or crawl, and the claimant must avoid even moderate exposure to hazards such as machinery or heights; limited to only frequent handling and/or fingering; can understand, remember and follow simple instructions for routine tasks; can complete familiar routine task without expectations for sustained close concentration, fast pace, or high production standards; and can adapt in a stable setting with predictable expectations and infrequent changes in routine.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant has a limited education (20 CFR 404.1564 and 416.964).

8.   From September 10, 2019 through May 31, 2021, the claimant was under age 55, which was considered to be an individual of closely approaching advanced age (20 CFR 404.1563 and 416.963).

9.   The claimant is found to have attained age 55 on July 22, 2021, which is less than two months after the decision dated June 1, 2021.  Therefore, as of June 1, 2021, the claimant is considered an individual of advanced age based on factors that support application of the borderline age policy.

10.  From September 10, 2019 through May 31, 2021, if the claimant had the capacity to perform the full range of work at the light exertional level, based on the claimant's age, education, and work experience, 20 CFR 404.1569 and 416.9650, and Medical-Vocational Rule 202.11 in Table No. 2 of 20 CFR Part 404, Subpart P, Appendix 2 would direct a conclusion of not disabled.  Therefore, the framework of Medical-Vocational Rule 202.11 indicates a finding of not disabled is required.  During the period between September 10, 2019 through May 31, 2021, the claimant was not disabled.

11.  Beginning on June 1, 2021, Medical-Vocational Rule 202.02 in Table No. 2 of 20 CFR Part 404, Subpart P, Appendix 2 directs a conclusion of disabled based on the claimant's age, education, and work experience.

12.  The claimant is disabled beginning June 1, 2021, but not before that date.

11

(Tr. 12-13.)

## V.   STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

12

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

As noted above, both the ALJ and the Appeals Council issued written decisions in this case. The Sixth Circuit has explained that "[w]here the Appeals Council denies review of the ALJ's decision, the ALJ's decision becomes the decision of the Commissioner." *Taylor v. Comm'r of Soc. Sec.*, No. 95–3767, 1996 WL 400175, at *4 (6th Cir. July 16, 1996). "In a case ... where the findings of the [ALJ] and the Appeals Council are in conflict, the question before us is whether substantial evidence supports the Appeals Council's decision." *Johnson v. Secretary of Health and Human Servs.*, 948 F.2d 989, 992 (6th

Cir.1991)).  *See also Garcia v. Comm'r of Soc. Sec.*, 732 F. App'x 425, 428 (6th Cir. May 10, 2018).

However, "where the Appeals Council adopted or relied on the findings of the ALJ concerning an issue,

the appeal of that issue involves the findings of both the ALJ and the Appeals Council, and the substantial

evidence standard of review applies to the findings regardless of whether they were made by the Appeals

Council, the ALJ, or were made by the Appeals Council in reliance on the ALJ's findings."  *Taylor*, 1996

WL 400175, at *4 n 2.  *See also Cunningham v. Colvin*, No. 1:13–CV–2487, 2014 WL 7238536, at *9

(N.D. Ohio Dec. 17, 2014); *Mader v. Astrue*, No. 3:10CV0263, 2011 WL 2650183, at *11 n.6 (S.D. Ohio

June 16, 2011).

Here, the Appeals Council "adopt[ed] the Administrative Law Judge's statements regarding the

pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social

Security Rulings and Acquiescence Rulings, the issues in the case, and the evidentiary facts, as

applicable."  (Tr. 8.)  Further, the Appeals Council adopted the ALJ's "findings at steps one, two, three,

four, and five of the sequential evaluation process for the period prior to June 1, 2021," as well as the

ALJ's RFC and credibility findings and the findings regarding the persuasiveness of the medical opinions

in the record. (*Id.* at 10-11.)  The Appeals Council nevertheless issued its own written decision because it

disagreed with the ALJ on the date Bennett became disabled and the ALJ's findings regarding the

"paragraph B" criteria.  (*Id.* at 9.)

Thus, to the extent the issues presented involve findings and conclusions of the ALJ that were

adopted by the Appeals Council, the Court reviews the findings of both the Appeals Council and the ALJ

under the substantial evidence standard of review.

A.      **Bennett's Carpal Tunnel Syndrome**

1.      **Step Two**

In Bennett's first assignment of error, she argues the ALJ erred in finding her carpal tunnel syndrome ("CTS") non-severe at Step Two and in failing to explain or address her CTS in listing her severe impairments.  (Doc. No. 10 at 10-11.)  In addition, Bennett argues the ALJ further erred in limiting her to frequent fingering and handling, as he relied "on remote opinions of reviewing physicians who were unaware of [her] need for a carpal tunnel release" and failed to "adequately evaluate [her] post-surgical functioning, her testimony regarding continuing difficulties with gripping and grasping, and the need for a right carpal tunnel release . . . ."  (*Id.* at 11, 14.)

The Commissioner responds that while "the ALJ failed to explicitly discuss CTS at Step Two, any resulting error is harmless because the condition was considered at subsequent steps of the sequential evaluation," and substantial evidence supports the ALJ's evaluation of Bennett's CTS and related limitations in the RFC.  (Doc. No. 11 at 11.)

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques.  *See* 20 CFR §§ 404.1521, 416.921; Social Security Ruling ("SSR") 96–4p, 1996 WL 374187, at *1 (July 2, 1996).  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  *Id.*

"[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone."  *Id.*  Thus, "regardless of how many symptoms an individual alleges, or how genuine

15

the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings."  SSR 96–4p (footnote omitted).  *See also* 20 C.F.R. §§ 404.1529(b), 416.929(b) ("Your symptoms . . .  will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present.").  *See also Torrez v. Comm'r of Soc. Sec.*, No. 3:16CV00918, 2017 WL 749185, at *6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec.*, 2:15-cv-3103, 2017 WL 655402, at *8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (N.D. Ohio March 30, 2017).  The claimant bears the burden of establishing the existence of a medically determinable impairment.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require.").  *See also Kavalousky v. Colvin*, No. 5:12-CV-2162, 2013 WL 1910433, at *7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of Social Security regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . ."  20 CFR §§ 404.1520(c), 416.920(c).  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1522(b), 416.922(b).  Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding

appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id.*

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n.2, intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184 at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim."  *Id.*  "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do."  *Id.*

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error."  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least one severe impairment) and a claimant's severe and non-severe impairments are considered at the

remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony*, 266 F. App'x at 457.

At Step Two, the ALJ found Bennett's osteoarthritis of the knees, lumbar strain, morbid obesity, major depressive disorder, and anxiety disorder severe. (Tr. 29.) The ALJ further found as follows:

> In reviewing the record, special attention was given to the duration and frequency of medical conditions for which the claimant sought treatment. The evidence supports that the claimant also has the medically determinable impairments of coronary artery disease, diabetes mellitus, and mild intermittent asthma without complication.
>
> The evidence supports that the signs and symptoms associated with her coronary artery disease, diabetes mellitus, and mild intermittent asthma without complication were no more than mild. Treatment notes from October 4, 2019 reflect a diagnosis for diabetes mellitus. Her diabetic foot examination was normal, to include normal sensation, intact vasculature, and normal strength. It was noted that her diabetic eye examination from August 2019 revealed no evidence of retinopathy. Her prescription for Metformin was renewed (2F/8 - 12). Treatment notes from August 18, 2020 reflect that her diabetes was diet controlled (9F/2 -6). During her annual diabetic eye examination with James Scott Lane, MD on August 19, 2020, there was no sign of diabetic retinopathy (10F/6-10). Further, treatment notes from November 11, 2020 reflect a history of mild intermittent asthma, which she treated with albuterol HFA. However, she noted it was related to seasonal allergies, and that she had no recent exacerbations, shortness of breath, or dyspnea on exertion. Additionally, it was noted that she had a history of coronary artery disease, but no active treatment at that time. She exhibited normal breath sounds upon examination. She demonstrated rhonchi in the upper lungs that cleared with coughing, and no evidence of wheezes, crackles, or rales. Her most recent A1C was noted to be 5.7 percent. She was assessed with diabetes mellitus type 2 without retinopathy and mild intermittent asthma without complication (11F/14-20).
>
> Accordingly, the undersigned finds that these impairments caused only a slight abnormality having such minimal effect that they would not be expected to interfere with an individual's ability to work, irrespective of age, education or work experience and are therefore, non-severe.

(*Id.*)

While the ALJ failed to mention Bennett's CTS at Step Two, he considered Bennett's CTS and its impacts in the RFC analysis, limiting her to frequent handling and fingering. (*Id.* at 32-36.) As the ALJ considered Bennett's impairments, severe and non-severe, in the RFC analysis, there is no reversible error.

18

## 2.    RFC

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. §§ 404.1546(c), 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every

piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

To the extent Bennett argues the Commissioner erred because the RFC is not supported by a medical opinion, the Sixth Circuit has specifically rejected such an argument, finding "the Commissioner has final responsibility for determining an individual's RFC . . . and to require the ALJ to base her RFC finding on a physician's opinion 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).  *See also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) ("We have previously rejected the argument that a

residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."); *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-443 (6th Cir. 2017).

Bennett also argues the ALJ "failed to satisfy his chief responsibility" of considering all the evidence in the record when he found the opinions of the state agency physicians persuasive despite them finding no hand limitations and being offered before Bennett's CTS surgical evaluation and left CTS surgery.  (Doc. No. 10 at 13.)  However, it is proper for an ALJ to credit a state agency consultant's opinion when it is "supported by the totality of evidence in the record, and the ALJ considered the evidence obtained after the consultant issued his opinion."  *Myland v. Comm'r of Soc. Sec.*, Case No. 17-1592, 2017 WL 5632842, at *2 (6th Cir. Nov. 13, 2017).  *See also Ruby v. Colvin*, Case No. 2:13-CV-01254, 2015 WL 1000672, at *4 (S.D. Ohio Mar. 5, 2015) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."); *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions).

Here, the ALJ's decision demonstrates he considered the entire record.  In the decision, the ALJ included a detailed discussion of the evidence post-dating the state agency reviewing physicians' opinions. (Tr. 32-37.)  Moreover, the ALJ determined that "[d]ue to her bilateral carpal tunnel syndrome with associated positive Phelan/Tinel signs as well as decreased grip strength, she should lift/carry no more than 20 pounds occasionally and 10 pounds frequently, and no more than frequently handle and/or finger bilaterally."  (*Id.* at 35.)

There is no error.

**B.      Bennett's Ability to Stand and Walk**

In her second assignment of error, Bennett argues the ALJ's finding that she had the "residual functional capacity to perform the requisite standing and walking for light work activity" lacks the support of substantial evidence.  (Doc. No. 10 at 14.)  Bennett asserts:

> Counsel recognizes that the ALJ found the non-examining opinions of Dr. Das and Dr. Klyop to be persuasive and that these physicians found that Ms. Bennett could stand and walk six hours out of an eight-hour workday (A.R. 36, 75, 102). These doctors provided the basis for the ALJ's finding that Plaintiff could perform light work. However, the ALJ misinterpreted the review of objective medical evidence concerning x-ray findings. Dr. Das' assessment does not refer to Ms. Bennett's knee x-ray (A.R. 75) and Dr. Klyop stated that the x-ray only showed severe bilateral medial compartment osteoarthritis (A.R. 102). Ms. Bennett has complained of chronic bilateral knee pain and the x-ray on July 29, 2019 revealed not only severe bilateral medial compartment joint space narrowing, but also **bone-on-bone articulation** and subchondral sclerosis and tricompartment marginal osteophytes (A.R. 369). Substantial evidence cannot be based on fragments of the record. *Laskowski v. Apfel*, 100 F.Supp. 2d, 474, 482 (E.D. Mich 2000). The full extent of the objective findings on Ms. Bennett's knee x-ray were not adequately addressed by the ALJ and are inconsistent with a light residual functional capacity finding.

(*Id.* at 15) (emphasis in original).  Bennett also points to evidence she believes supports a more restrictive RFC.  (*Id.* at 15-16.)

The Commissioner responds that substantial evidence supports the standing and walking limitations in the RFC.  (Doc. No. 11 at 15.)  The Commissioner argues that the state agency reviewing physicians "summarized the x-ray by accurately repeating the diagnostic impression provided by the radiologist and Plaintiff's treatment provider, the ALJ found their findings persuasive, and the Appeals Council adopted the ALJ's evaluation."  (*Id.* at 16.)  To the extent there is evidence supporting Bennett's "preferred finding" in the record, that is not enough to show the Commissioner's contrary findings lacked substantial evidence.  (*Id.* at 17.)  Finally, the Commissioner asserts Bennett failed to produce any medical opinion evidence that "she was incapable of performing the standing or walking required of light work." (*Id.*)

Substantial evidence supports the RFC findings.  The ALJ considered the x-ray relied on by Bennett, and cited the diagnostic impression provided by the radiologist in his analysis.  (Tr. 35.)  In his RFC analysis, the ALJ found as follows:

> However, the claimant's statements about the intensity, persistence, and limiting effects of her symptoms are inconsistent because the level of limitation alleged is not altogether supported by the objective findings. Findings of gait abnormalities are not consistent in the record, and there is no evidence of use of an assistance ambulatory device (6F, 7F). The record contains evidence of 5/5 strength in all muscle groups, to include 5/5 bilateral grip strength (1F/14-18, 7F). Treatment notes reflect findings of full range of motion of her joints, to include her lumbar spine bilateral knees, bilateral hands/wrists, and bilateral fingers (1F/26-27, 2F/8-12, 7F). Her sensation was intact to light touch, and she showed improvements in active range of motion of her knees, increased strength, and improved functional mobility with physical therapy (1F/12 -14, 1F/14-18, 1F/24-25, 7F). Treatment for the claimant's mental impairments was limited and conservative. She displayed normal memory, and did not appear to lose concentration upon examination (6F, 9F/2-6). The evidence contains findings of a normal affect, intact insight and judgment, as well as a cooperative presentation (2F/8-12, 6F). Further, she reported that she was able to prepare meals, perform household chores, drive, shop in stores, and manage her money independently (6E, 7E).
>
> Nonetheless, functional limitations are warranted. To account for the pain associated with her bilateral knee osteoarthritis and lumbar strain, she should stand/walk no more than six hours in an eight-hour workday and never climb ladders, ropes, or scaffolds. Due to her bilateral carpal tunnel syndrome with associated positive Phelan/Tinel signs as well as decreased grip strength, she should lift/carry no more than 20 pounds occasionally and 10 pounds frequently, and no more than frequently handle and/or finger bilaterally. Due to loss of musculoskeletal range of motion and the effects of her obese body habitus, she should only frequently stoop or crouch and only occasionally kneel or crawl. To account for findings of gait abnormalities, she should avoid even moderate exposure to hazards such as machinery or heights. She is limited to understanding, remembering, and following simple instructions for routine tasks due to her noted difficulty maintaining focus and memory, as well as reported limitations with reading and writing. To avoid exacerbating her symptoms with stress, she should complete familiar routine tasks without expectations for sustained close concentration, fast pace, or high production standards. Further, due to reported difficulty managing pressure, she would be able to adapt in a stable setting with predictable expectations and infrequent changes in routine.
>
> *  *  *

The State agency medical consultants, Elizabeth Das, MD and Gerald Klyop, MD, assessed that the claimant retained the ability to perform work at the light exertional level with occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds, only frequent stooping and crouching, only occasional kneeling, and crawling, and avoiding even moderate exposure to hazards (3A, 4A, 7A, 8A). The undersigned finds this assessment to be persuasive in that it is consistent with degeneration in the claimant's bilateral knees and lumbar spine with associated pain, loss of musculoskeletal range of motion, gait abnormalities, and the effects of her carpal tunnel syndrome and obese body habitus, as described above. For these reasons, the assessment of Dr. Bradford is unpersuasive as it includes no functional limitations associated with her assessed impairments. However, a greater level of limitation than included in the residual functional capacity above is not consistent with the overall findings. For example, evidence of loss of musculoskeletal strength is not consistent in the record, and therefore, no limitation for climbing ramps and stairs is supported (1F/14-18, 7F). Further, greater limitations are inconsistent with findings of intact sensation bilaterally, no use of an ambulatory device, evidence of full range of motion in her spine, bilateral knees, as well as her bilateral hands/wrists and fingers (1F/14-18, 1F/24-25, 1F/26-27, 2F/8-12, 7F).

(*Id.* at 35-36.)

At bottom, Bennett's argument is nothing more than a request for this Court to reweigh the evidence, which it cannot do. While Bennett interprets the records differently, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

There is no error.

### VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

24

Date: December 15, 2022

                                        *s/ Jonathan Greenberg*
                                        Jonathan D. Greenberg
                                        United States Magistrate Judge